Filed 2/20/26  P. v. Esquivel CA6
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUCIANO CORDERO ESQUIVEL,<br><br>    Defendant and Appellant. | H049721<br>(Santa Clara County<br>Super. Ct. Nos. C1627960, C1919379)<br><br>ORDER MODIFYING OPINION,<br>DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD DEANDA et al.,<br><br>    Defendants and Appellants. | H049784<br>(Santa Clara County<br>Super. Ct. No. C1627960) |

THE COURT:

It is ordered that the opinion filed herein on February 4, 2026, be modified as follows:

1. At the end of the first paragraph of the disposition, on page 18, the following sentence shall be added:

When preparing the abstract of judgment on resentencing for defendant Luciano Cordero Esquivel, the clerk of court shall note that the multiple-murder special-circumstance allegation as to count 2 was vacated.

There is no change in the judgment.  Appellant's petition for rehearing is denied.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P. J.



_____
GROVER, J.




*People v. Esquivel*
H049721
*People v. Deanda et al.*
H049784

Filed 2/4/26  P. v. Esquivel CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUCIANO CORDERO ESQUIVEL,<br><br>    Defendant and Appellant. | H049721<br>(Santa Clara County<br> Super. Ct. Nos. C1627960, C1919379) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD DEANDA et al.,<br><br>    Defendants and Appellants. | H049784<br>(Santa Clara County<br> Super. Ct. No. C1627960) |

Defendants Luis Bracamonte, Richard Deanda, and Luciano Cordero Esquivel appeal from their judgments of conviction following a jury trial in case number C1627960 that resulted in multiple convictions of murder and robbery (for Esquivel) and assault and active participation in a criminal street gang (for all three defendants). Esquivel, a Sureño gang member, was involved in three incidents—a robbery, a murder, and an assault at a Carl's Jr. restaurant that resulted in a murder. Deanda and

Bracamonte, both also Sureño gang members, took part in the assault at the Carl's Jr. restaurant. On appeal defendants argue (1) the prosecutor discriminatorily exercised peremptory challenges on prospective Hispanic jurors, (2) they are entitled to the retroactive application of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assem. Bill No. 333), and (3) several sentencing errors require correction. Esquivel separately appeals from his conviction by plea in case number C1919379, arguing that the abstract of judgment in that case contains a clerical error.

In case number C1627960, we find merit in the defendants' arguments pertaining to Assembly Bill No. 333 and vacate their gang-related counts and enhancements in case number C1627960. We reverse and remand the matter for possible retrial. As for case number C1919379, we affirm the judgment subject to correction of the clerical error.

## I.  BACKGROUND

### A.  *Case Number C1627960*

In the operative fourth amended information, the Santa Clara County District Attorney charged Esquivel by amended information with two counts of murder (Pen. Code, § 187, subd. (a)[1]; counts 1 [Andrea Aguirre] and 2 [Jose Luis Marin]), attempted murder (§§ 664, subd. (a), 187; count 3 [Jason M.]), a count of assault with a deadly weapon (§ 245 subd. (a)(1); count 7 [D.L.]), second degree robbery (§ 212.5, subd. (c); count 8 [Jesse M.]), and participation in a criminal street gang (§ 186.22, subd. (a); count 9). As to both murder charges, the information alleged a multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and a gang-murder special circumstance (§ 190.2, subd. (a)(22)). The information also alleged gang enhancements under section 186.22, subdivision (b)(5) as to counts 1 and 2, under section 186.22, subd. (b)(1)(C) for counts 3 and 8, and under section 186.22, subd. (b)(1)(B) for count 7. It was also further alleged

---

[1] Unspecified statutory references are to the Penal Code.

that Esquivel had a prior juvenile adjudication for robbery that qualified as a strike (§ 1170.12).

As for Deanda and Bracamonte, the Santa Clara County District Attorney charged them both by information with three counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 4 [Andrea Aguirre], 5 [Jason M.], and 6 [E.V.]) with gang enhancements (§ 186.22, subd. (b)(1)(B)). And, along with Esquivel, both Deanda and Bracamonte were charged with participation in a criminal street gang (§ 186.22, subd. (a); count 9).

### 1. *The Evidence[2]*

In December 2015, Esquivel was involved in a robbery and in two assaults that each resulted in a murder. Deanda and Bracamonte were involved in one of the assaults. At the time, Esquivel was a "participant" in the Sur Santos Pride (SSP) criminal street gang, a subset of the Sureño criminal street gang. Deanda and Bracamonte were SSP gang members.

The two offenses that Esquivel committed alone were a robbery and a murder early Christmas morning in 2015. After midnight that morning, Esquivel was with Hector Segura Gonzalez, a member of Varrio Virginia Trece, a Sureño criminal street gang, when they encountered Jesse M. at a 7-Eleven store. Esquivel threatened to stab Jesse M. for his wallet. Jesse M. gave Esquivel his wallet, his jacket, and a case of beer.

Later that same morning, Segura Gonzalez and Esquivel were joined by Brian Gutierrez. The three went to a gas station in a "Northerner" area, where they encountered three men—O.P., S.P., and victim Jose Luis Marin. After a verbal exchange between the two groups, Esquivel fatally stabbed Marin.

---

[2] Because defendants raise challenges related to the prosecutor's use of peremptory challenges, instructional error, and sentencing issues, we provide only an abbreviated summary of the facts. The circumstances of the offenses are largely irrelevant to the issues raised on appeal.

The third crime followed four days later on December 29, 2015, when Deanda, Bracamonte, Esquivel, and several other SSP members responded to another SSP member's call for help at a Carl's Jr. restaurant, where the caller reported that some Norteños were about to jump him. After the Sureño gang members reached the restaurant, there was a confrontation between them and three Norteño gang members— E.V., Andrea Aguirre, and Jason M. Esquivel was armed with a hunting knife, Deanda with a switchblade, and Bracamonte with a crowbar.

During the confrontation, Aguirre hit Esquivel with a broomstick, and Esquivel stabbed her in the neck. Aguirre later died of her injuries. Esquivel also tried to stab one of the men, and Deanda ran towards them, later bragging that he had stabbed "the . . . short guy." Jason M., the third individual, had been "dropped" by other Sureños; Esquivel then tried to stab him, and Bracamonte tried to hit him with a crowbar.

As the SSP gang members left the restaurant, Esquivel threatened D.L., a restaurant employee who had stepped outside to note the license plate of their car.

### 2. Verdict and Sentencing

In May 2021, the jury convicted all defendants of all charged counts and found all special circumstance and enhancements to be true. As to Esquivel, the trial court found true in a bifurcated proceeding the allegation that he had a prior juvenile adjudication that qualified as a strike.

In December 2021, the trial court sentenced Esquivel to two consecutive terms of life in prison without the possibility of parole consecutive to a determinate term of 40 years for his convictions, staying under section 654 a six-year sentence for active participation in a criminal street gang (count 9).[3] The trial court sentenced both Deanda

---

[3] The trial court vacated the multiple-murder special-circumstance finding as to count 2. (See *People v. Allen* (1986) 42 Cal.3d 1222, 1273 [improper to allege more than one multiple-murder special circumstance for multiple murder counts]; see also *People v.*

4

and Bracamonte to a total term of eight years each, staying under section 654 their 16-month sentences for active participation in a criminal street gang.

## B.    *Case Number C1919379*

In October 2019, the Santa Clara County District Attorney charged Esquivel by complaint with assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). The district attorney also alleged that Esquivel had a prior juvenile adjudication that qualified as a strike (§ 1170.12).

In June 2021, Esquivel negotiated a plea agreement in case number C1919379 in which he agreed to plead guilty to the assault charge and admit the prior strike in exchange for two years in prison, consecutive to the sentence that was to be imposed in case number C1627960. In December 2021, the trial court imposed the agreed-upon term of two years in prison, consecutive to the term of imprisonment imposed in case number C1627960.

## II.    DISCUSSION

## A.    *The* **Batson-Wheeler**[4] *Objections in Case Number C1627960*

On appeal, defendants challenge the prosecutor's peremptory challenge to two prospective jurors, C.R. and M.G., arguing the prosecutor removed them because of their race. Joined by both codefendants, Esquivel's trial counsel objected to the prosecutor's peremptory challenges, arguing that both C.R. and M.G. were "Latinos, . . . all of Hispanic, Mexican American descent" like Esquivel.[5] As the trial court made a sincere

*Nunez and Satele* (2013) 57 Cal.4th 1, 49 [vacating duplicative multiple-murder special circumstance].)

[4] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[5] The prosecutor argued that there was "no evidence that these [jurors] are of a particular nationality" but conceded that the jurors "appear to be or represented

5

and reasoned attempt to evaluate the proffered reasons for challenging both C.R. and M.G., we deferentially review for substantial evidence its determination that the prosecutor's race-neutral explanation for challenging both jurors was credible. (See *People v. McDermott* (2002) 28 Cal.4th 946, 970 (*McDermott*).) Finding substantial evidence to support the court's decision, we lack authority to second-guess that credibility determination.

### 1. *Legal Principles and Standard of Review*

A peremptory challenge "may be predicated on a broad spectrum of evidence suggestive of [conscious or unconscious] juror partiality," and that broad spectrum may range from the "obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) But exercising a peremptory challenge based on the juror's race or ethnicity violates equal protection principles under both the federal and state constitutions. (*Batson*, *supra*, 476 U.S. 79; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157 (*Gutierrez*).) Even a single challenge based on race or ethnicity amounts to structural error requiring reversal. (*People v. Cleveland* (2004) 32 Cal.4th 704, 734; *Gutierrez*, at p. 1158.)

*Batson/Wheeler* claims[6] have been evaluated in three steps, only the last of which is at issue. A party raising a *Batson/Wheeler* motion must first "demonstrate a prima

---

themselves . . . to be Hispanic people, people of Latin American descent." The Attorney General on appeal does not dispute that both M.G. and C.R. share defendants' ethnicity.

[6] Effective January 1, 2021, the Legislature enacted Code of Civil Procedure section 231.7 (Stats. 2020, ch. 318, § 2), "creat[ing] new procedures for identifying unlawful discrimination in the use of peremptory challenges." (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943; see also Stats. 2025, ch. 656, § 1 [reenacting with amendments].) But this trial took place before the new statute's operative date. (Code Civ. Proc., § 231.7, subd. (i) [applying only to "jury trials in which jury selection begins on or after January 1, 2022"].) We therefore consider only the constitutional claim, not a

facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1158.) Second, once a prima facie showing has been made, the burden shifts to the opposing party to give a "nondiscriminatory explanation for the challenges."[7] (*Gutierrez*, at p. 1158.) Third, "if the opponent . . . tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination"—that "it was ' "more likely than not that the challenge was improperly motivated." ' " (*Ibid.*)

This third step requires the trial court to assess the credibility of the prosecutor's explanation, and the trial court can consider factors such as the prosecutor's demeanor, the improbability of the prosecutor's reasons, or whether the prosecutor's explanation can be considered sound trial strategy. (*Gutierrez*, *supra*, 2 Cal.5th at p. 1158.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

"The trial court's ruling on this [third step] is reviewed for substantial evidence," so long as " 'the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.' " (*McDermott*, *supra*, 28 Cal.4th at p. 971.) And "[w]e review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' " (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*Ibid.*) And "[w]hen the prosecutor's stated reasons are both inherently plausible and

---

statutory one. (See *People v. Nadey* (2024) 16 Cal.5th 102, 124–125 [applying three-step *Batson/Wheeler* framework in pre-Code Civ. Proc., § 231.7 case].)

[7] The trial court here did not expressly find that the defense satisfied its prima facie showing before seeking an explanation from the prosecutor. We accordingly "infer an implied prima facie finding." (*People v. Arias* (1996) 13 Cal.4th 92, 135.)

7

supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

### 2. C.R. (Proposed Juror No. 2)

The prosecutor identified two reasons for his challenge to C.R.—first, that his work schedule "during the course of jury selection and potentially during evidence" jeopardized his ability to effectively serve on the jury; second, that C.R. said his experience with a brother who had been a gang member could be a source of bias. The prosecutor's stated reasons were inherently plausible. "Factors indicating a difficulty or inability to focus on the evidence may serve to justify a peremptory challenge." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1124; see also *United States v. Power* (9th Cir. 1989) 881 F.2d 733, 740 [behavior suggesting that a juror may not be attentive was "a neutral, reasonable basis for its use of a peremptory challenge"].) And familiarity with gangs has been deemed sufficient reason to exercise peremptory challenge even when the juror avers that defendant's putative gang membership " 'wouldn't mean a thing.' " (*People v. Williams* (1997) 16 Cal.4th 153, 191 (*Williams*); see also *People v. Aguirre* (2025) 18 Cal.5th 629, 669 (*Aguirre*) [prospective juror's childhood experiences with gangs "could further detract from his ability to view the [gang] evidence presented at trial from a fresh perspective"].) And C.R.'s responses in voir dire were sufficient to support the prosecutor's explanation and the trial court's judgment that the explanation was credible. (*Silva*, *supra*, 25 Cal.4th at p. 386.)

Preliminarily, we reject defendants' claim that the trial court made no sincere and reasoned attempt to evaluate the prosecutor's stated reasons. The trial court here " 'denied the motions only after observing the relevant voir dire and listening to the prosecutor's reasons supporting each strike and to any defense argument supporting the motions.' " (*People v. Jones* (2011) 51 Cal.4th 346, 361 (*Jones*).) The court also explained why it found the prosecutor's reasons credible, summarizing its own recollection of C.R.'s answers. Thus, " '[n]othing in the record suggests that the trial

8

court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty.' " (*Ibid*.) Because the stated reasons here are " ' "both inherently plausible and supported by the record," ' " the trial court was not required to further question the prosecutor or make additional, detailed findings. (*People v. Mai* (2013) 57 Cal.4th 986, 1054.) The trial court's credibility determinations are accordingly entitled to deference, leaving us to assess only whether substantial evidence supports the denial of the motion. (See *McDermott*, *supra*, 28 Cal.4th at pp. 970–971.)

The prosecutor's stated concern about C.R.'s work schedule finds support in the record. C.R. himself cited fatigue from his work schedule in support of a request to leave court early one day—explaining that he had been awake "since 8:00 yesterday." To several follow-up questions about his work schedule, C.R. answered that he was working the graveyard shift—starting work at 10:00 p.m.—after which he "stayed in the parking lot" until his day in court began. He also acknowledged that it would be "difficult" to ensure he was rested and able to listen and participate and concentrate on the trial. C.R. expected he would be on the graveyard shift for at most two weeks, possibly less if a coworker returned to work.[8] C.R. also explained that his work varied because of surges related to COVID-19 and "overtime that has to be worked into a small department," adding that just "a couple weeks ago" his work had been "pretty hectic." Even though C.R. later assured the trial court that he was prepared to be well rested to ensure his participation and full concentration at trial, "neither the prosecutor nor the trial court was required to take [his] answers at face value." (*People v. Boyette* (2002) 29 Cal.4th 381,

---

[8] By the time the prosecutor asked that C.R. be excused, C.R.'s estimated two weeks on a graveyard shift would have been nearing an end. But defense counsel did not bring this possibility to the trial court's attention in opposing the prosecutor's proffered explanation. Moreover, "[t]he proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924 (*Reynoso*).)

422.)  Indeed, the prosecutor represented without dispute that there had been times when C.R. would appear at court looking "rundown," and the trial court relatedly noted that C.R. had previously mentioned "his scheduling difficulty and his sleeping schedule." Because the trial court was in the best position to assess the prosecutor's demeanor-based rationale for excusing C.R., we give great deference to the court's implied finding that the prosecutor's reasons were sincere.  (*Reynoso*, *supra*, 31 Cal.4th at p. 926.)

The prosecutor's second stated reason for challenging C.R.—his apparent equivocation during his explanation about his bias towards gangs—was also inherently plausible.  C.R. had written in his juror questionnaire that 25 years ago, his oldest brother had claimed gang membership.  Questioned by Esquivel's counsel, C.R. initially said that because of "issues that have gone on with gangs in [his] family," he would *not* be impartial.  C.R. added that he had some bias about gang activity because of his brother's and a cousin's experiences with gangs.  At one point, the prosecutor asked C.R. if he recalled saying that he would "hold that against the People's case," to which C.R. responded, "[a] little," before promptly clarifying that his bias would favor the prosecution.

Referring to his notes, the prosecutor stated that C.R. had indicated both that he would "hold the People to a higher burden" and that he "would have a bias in favor of the People against the defense."  Either way, the prosecutor claimed he was "not looking for bias" on the jury and that it was C.R.'s confusing answers that made the prosecutor think he "would [not] be a good juror."

The orientation of C.R.'s purported bias notwithstanding, his answers supplied substantial evidence for the prosecutor's stated concern that the juror's family experience with gangs were a potential source of bias.  (See, e.g., *Williams*, *supra*, 16 Cal.4th at p. 191.)  C.R. himself said that he felt he had a bias about gangs.

We acknowledge the prosecutor's initial error in believing that C.R.'s bias would favor the defense rather than the prosecution.  But this belief has been deemed reasonable

10

by the California Supreme Court on comparable facts. (*People v. Farnam* (2002) 28 Cal.4th 107, 138; *Williams*, *supra*, 16 Cal.4th at p. 191; *People v. Watson* (2008) 43 Cal.4th 652, 674 [substantial exposure to gangs may be valid race-neutral reason to exercise peremptory challenge]; *Aguirre*, *supra*, 18 Cal.5th at p. 669.) "[A]ny mistake or ambiguity involved in the articulation of this reason does not indicate that it or the prosecution's . . . stated reasons were pretextual." (*Aguirre*, at p. 669.)

Nor have we any basis to infer that the prosecutor's initial misstatement of C.R.'s testimony was more than a good-faith mistake, when the prosecutor specifically sought to confirm his understanding with C.R. and later did not repeat the error. An honest mistake of fact does not show that the prosecutor's peremptory challenge was motivated by C.R.'s race.[9] (*Jones*, *supra*, 51 Cal.4th at p. 366; *Aguirre*, *supra*, 18 Cal.5th at p. 669 [" ' "no *Batson* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason" ' "].) And "any mistake or ambiguity involved in the articulation of this reason does not indicate that it or the prosecution's . . . stated reasons were pretextual." (*Aguirre*, at p. 669.) Our focus under *Batson/Wheeler* is not on whether the prosecutor's stated reason was objectively reasonable on its face: " '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.' " (*People v. Arellano* (2016) 245 Cal.App.4th 1139, 1163 (*Arellano*).)

---

[9] We note that our constitutional inquiry here was designed to protect against only "[*p*]*urposeful* racial discrimination." (*Batson*, *supra*, 476 U.S. at p. 86, italics added.) The *Batson/Wheeler* framework "plainly fail[ed] to protect against—and likely facilitate[d]—implicit bias," which "is increasingly accepted as pervasive throughout the criminal justice system, and it is particularly pernicious in the context of peremptory challenges." (*People v. Bryant* (2019) 40 Cal.App.5th 525, 545 (conc. opn. of Humes, P. J.).) Indeed, the Legislature acknowledged the "impact of cognitive implicit bias on the use of peremptory challenges" in enacting Code of Civil Procedure section 231.7. (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 278). Trial courts "need not find purposeful discrimination" under Code of Civil Procedure section 231.7, subdivision (d)(1).

We see no reason to challenge the trial court's acceptance of the prosecutor's reasons here.

### 3. *M.G. (Proposed Juror No. 11)*

The prosecutor said that he had excused M.G. out of concern that she was less than candid about the risk that anxiety or emotional strain as a juror might bias her in favor of defendants. "Factors indicating a difficulty or inability to focus on the evidence may serve to justify a peremptory challenge." (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1124.) And it is also race neutral to excuse a juror based on "[c]oncern[s] that a prospective juror is . . . overwhelmed by outside stresses." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 113.) Because the record supports the prosecutor's stated plausible reasons, we discern no error in the trial court's acceptance of these reasons. (Cf. *Silva*, *supra*, 25 Cal.4th at p. 386 [violation of equal protection clause despite trial court's ultimate finding, where both proffered reasons for striking one juror "were factually unsupported by the record"].)

Substantial evidence supports the prosecutor's concern that M.G. was minimizing the extent to which the trial was likely to impact her mental health. M.G.'s written questionnaire initially indicated nothing to suggest a particular risk of anxiety about jury service. It was only later that the court questioned M.G. about her mental health: "I received information you called and you weren't feeling well last week.[10] And so the information I received was that you had spoken with a mental health provider" due to "feeling particularly stressed over the nature of this case." M.G. stated that she had contacted her mental health provider because she had been "a little stressed out" and wanted to ensure that she was her "tiptop self." She denied that this stress would prevent her from being fair and impartial but said that it would "affect" her emotionally and

---

[10] Voir dire had just resumed after a recess of more than a week. So M.G.'s call would have been during this recess.

might cause her "a little bit more waking up in the middle of the night." Asked by the prosecutor what she was thinking about when she woke in the middle of the night, M.G. demurred, saying she could not "really answer" and that "[w]e are all stressing." These answers justified the trial court in agreeing with the prosecutor that M.G.—having herself raised this issue of "mental distress"—"did waver at some point . . . and then try to backtrack" so as not "to appear to be wimpy."

M.G. also reiterated several times that she believed her mental distress over the proceedings paled in comparison to the defendants' situation. She expressed that the defendants were "going through a lot worse" and that she knew that her decision would be "affecting [the defendants'] lives." A "prosecutor's [stated] concern that . . . a person might be too sympathetic to the defense" is a race-neutral reason for excusal. (*Arellano*, *supra*, 245 Cal.App.4th at p. 1163.) And while another prosecutor might reasonably construe M.G.'s answers differently, this prosecutor's rationale for exercising a peremptory challenge on M.G., in part based on her statements about her mental health, is entitled to great deference. (*Reynoso*, *supra*, 31 Cal.4th at p. 926.) M.G.'s responses also adequately support the trial court's determination that she did in fact "express some sympathy towards the defendants in this case."

For these reasons, the trial court's denial of the *Batson/Wheeler* motion was not erroneous.[11]

## B.     *Retroactivity of Assembly Bill No. 333*

We accept as well taken the Attorney General's concession that Assembly Bill No. 333's amended definition of a criminal street gang is retroactive as to all three

---

[11] We also note that the prosecutor passed and accepted the jury multiple times with both C.R. and M.G. sitting in the panel. (See *Reynoso*, *supra*, 31 Cal.4th at p. 926 [observing that, "[a]lthough not a conclusive factor," the prosecutor's repeated acceptance of a jury comprising the later-challenged juror " 'may be an indication of the prosecutor's good faith' "].)

defendants and that any error in instructing the jury on the prior definition of a criminal street gang is not harmless, requiring reversal of the defendants' gang enhancements, gang special circumstances, and substantive gang offenses.

The gang expert testified at trial about the Sureño criminal street gang and the SSP subset. In part, the expert testified that gang members can gain status in the gang by fighting for the gang, and that fighting between SSP and Norteño gang members benefited SSP by showing the gang's strength. The expert also testified. about several predicate offenses committed by fellow Sureño gang members, which were supported by certified records of conviction.

But while the defendants' appeals were pending, the Legislature amended section 186.22's definition of a criminal street gang effective January 1, 2022. Assembly Bill No. 333 "narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons' "; it requires that the pattern of criminal activity foundational to a criminal street gang "have been '*collectively* engage[d] in' by members of the gang"; it also imposed further requirements limiting the offenses on which a pattern of criminal gang activity could be predicated; and it required that "for an offense to have commonly benefitted a street gang, . . . any 'common benefit' be 'more than reputational.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) Section 186.22, subdivision (g) specifies that "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."[12] Assembly Bill

[12] The jury found true gang-murder special-circumstance allegations as to Esquivel for counts 1 and 2. The gang-murder special circumstance (section 190.2, subdivision (a)(22)), expressly incorporates the definition of a criminal street gang as specified under section 186.22, subdivision (f). (See *People v. Rojas* (2023) 15 Cal.5th 561, 580 [Assem. Bill No. 333's definition of a criminal street gang amended also § 190.2, subd. (a)(22)].)

No. 333 applies retroactively to all cases not yet final as of its effective date. (*Tran*, at pp. 1206–1207 [following *In re Estrada* (1965) 63 Cal.2d 740].)

Here, the trial court instructed the jury on the then-applicable definition of a criminal street gang, omitting several of the requirements that have now been imposed by Assembly Bill No. 333. The jury instruction thus relieved the prosecution of its burden to prove *all* elements of the crime as now defined. (*People v. Cooper* (2023) 14 Cal.5th 735, 742 (*Cooper*).) So we apply the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18. (*Cooper*, at p. 742.) "When a jury instruction has omitted an element of an offense, our task 'is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*Id.* at pp. 742–743.) " '[T]he question is not whether there is evidence in the record that would support a jury finding of the missing element,' " but " 'whether we can conclude beyond a reasonable doubt that "the jury verdict would have been the same" had the jury been instructed on the missing element.' " (*People v. Lamb* (2024) 16 Cal.5th 400, 449.)

We cannot conclude any error was harmless beyond a reasonable doubt. At minimum, the instructions given omitted the new requirements that a pattern of criminal activity be *collectively engaged* in by members of the gang (§ 186.22, subd. (f)) and that for the offense to have commonly benefited the gang, the common benefit be more than reputational (*id.*, subd. (g)).[13] Indeed, the jury was instructed (under prior law) that the predicate offenses need not be gang related, and in doing so, the trial court essentially

---

[13] The jury was instructed on the offense of active participation in a criminal street gang with CALCRIM No. 1400 and the elements of the alleged gang enhancements with CALCRIM No. 1401. Both instructions referred to the definition of a criminal street gang under CALCRIM No. 736, which is the pattern instruction for the gang-murder special circumstance.

15

"directly contradict[ed]" subdivision (g)'s requirement that any benefit to the gang be more than reputational. (*Cooper*, *supra*, 14 Cal.5th at p. 744.)

Further, the gang expert's testimony about the predicate offenses offered scant details about the circumstances of each: He only offered a general description of each crime and identified the perpetrators as Sureño gang members; he did not address whether the predicate offenses were committed for the gang's common benefit. Several of the putative predicate offenses involved convictions subject to gang enhancements, but the gang enhancements attached to those convictions were likewise found true under the former version of section 186.22 and thus could have been found to have been committed only to further the gang's reputation. And when the jury in this case was considering whether the predicate offenses were sufficient under section 186.22, they were guided by expert testimony that gaining status in the gang can come from committing crimes for the gang or from defending the gang. "Based upon the record, a jury could have reasonably concluded that the predicate offenses at issue were committed for personal gain alone." (*Cooper*, *supra*, 14 Cal.5th at p. 744.)

In short, "the prosecution made no attempt to prove that the alleged predicate offenses provided a more than reputational common benefit to the gang and [defendants] made no such concession." (*Cooper*, *supra*, 14 Cal.5th at p. 743.) The error is not harmless, and we must therefore vacate the defendants' gang-related convictions and enhancements.

## C. *The Defendants' Additional Arguments on Sentencing Issues*

All three defendants will be entitled to a full resentencing upon remand, independent of the prosecution's election whether to pursue the gang charge or enhancements on remand. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) The full resentencing rule "allows a court to revisit all prior sentencing decisions when resentencing a defendant." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.) Therefore, we need not address Esquivel's arguments that the upper term sentences

16

imposed on counts 3 and 9 must be vacated and that he is entitled to the retroactive application of Senate Bill No. 567 (2021–2022 Reg. Sess.). We have already vacated Esquivel's conviction for count 9, and on remand, Esquivel will be entitled to a full resentencing under current law, including application of section 1170 as amended.

We observe, however, that neither Deanda nor Bracamonte can be ordered to pay restitution for any losses attributable to Esquivel's murder of Jose Luis Marin, as the Attorney General concedes. Neither Deanda nor Bracamonte were charged with any offense involving Marin, and nothing in the evidence before the jury or the court at sentencing implicated them in Marin's murder; it was accordingly error to make them jointly and severally liable for Marin's funeral expenses. (See § 1202.4, subd. (f) [authorizing restitution where "a victim has suffered economic loss as a result of the defendant's conduct"]; see also *People v. Scott* (1994) 9 Cal.4th 331, 354 [unauthorized sentence cannot be lawfully imposed].)

We note as well the parties' agreement that Esquivel's consolidated abstract of judgment, including both case numbers C1627960 and C1919379, requires correction independent of Assembly Bill No. 333.[14] First, in case number C1627960, the abstract of judgment erroneously lists as stayed count 2's multiple-murder special circumstance when the trial court vacated this finding. In case number C1919379, Esquivel's conviction for assault with force likely to produce great bodily injury in violation of section 245, subdivision (a)(4) is described on the abstract as "Asslt w/deadly wpn/force likely to prod GBI." We agree that an amended abstract should be reworded to avoid confusion between assault with a deadly weapon (§ 245, subd. (a)(1), (2), or (3))—a serious felony under section 1192.7—and assault by force likely to produce great bodily

---

[14] As the two cases were sentenced at the same time, the trial court prepared a consolidated abstract of judgment.

17

injury (§ 245, subd. (a)(4)).  (§ 1192.7, subd. (c) [listing serious felonies]; see *People v. Delgado* (2008) 43 Cal.4th 1059, 1065.)

## III.    DISPOSITION

In case number C1627960, defendants' convictions for participation in a criminal street gang (Pen. Code, § 186.22, subd. (a); count 9) are reversed, and the jury's true findings are vacated as to the gang-murder special circumstances (*id*., § 190.2, subd. (a)(22); counts 1 and 2) and the gang enhancements (*id.*, § 186.22, subd. (b); counts 1 through 8).  On remand, the Santa Clara County District Attorney may elect to prosecute the substantive gang offenses, gang special circumstances, and gang enhancements, and defendants shall be entitled to full resentencing.

In case number C1919379, the judgment is affirmed, subject to correction of the abstract of judgment to reflect that defendant Luciano Cordero Esquivel's conviction for violation of Penal Code section 245, subdivision (a)(4) was for assault with force likely to produce great bodily injury.

_____
LIE, J.

WE CONCUR:

_____
GREENWOOD, P. J.

_____
GROVER, J.

*People v. Esquivel*
H049721
*People v. Deanda et al.*
H049784